## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SOPHIE BELINDA TURNER** * | |
| **2 Elizabeth Close** | |
| **London** * | |
| **W9 1BN** | |
| **England** * | |
| **United Kingdom** | |
| * | **Case No. 1:23-cv-8349** |
| **Petitioner,** | |
| * | |
| **v.** | |
| * | |
| **JOSEPH ADAM JONAS** | |
| **199 Mott Street** * | |
| **New York, NY 10012** | |
| * | |
| **Respondent.** | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### VERIFIED PETITION FOR RETURN OF CHILDREN TO ENGLAND

**The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

Petitioner, Sophie Belinda Turner (the "Mother"), by and through her undersigned attorneys, files this Verified Petition for Return of Children to England (the "Petition"), against the Respondent, Joseph Adam Jonas (the "Father").

## I.      INTRODUCTION

1.      This Verified Petition is filed as a result of the wrongful retention of two children, WRJ, born in 2020, and DMJ, born in 2022 (collectively, the "children"), in New York City from their habitual residence of England.

2.      The wrongful retention of the children began on or about September 20, 2023.

1

DocuSign Envelope ID: 61CB8EEB-1DA7-45B3-A3AF-4E7DA62DB852

3.      This Verified Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention"), and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

4.      The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and the United Kingdom (which includes England) on July 1, 1988.[3]

5.      The objectives of the Convention are to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State, and to ensure that 'rights to custody' under the law of one Contracting State are effectively respected in other Contracting States.

## II.    JURISDICTION

6.      This Court has jurisdiction under ICARA § 9003 because this case involves the retention of two children under the age of 16 in the United States from their habitual residence of England. The children are currently located within the jurisdiction of this Court in the Southern District of New York.

7.      Congress has specifically granted concurrent original jurisdiction to the federal courts of actions arising under the Hague Convention. ICARA § 9003. State court custody actions may not trump clearly granted federal court jurisdiction to decide actions arising under the Hague Convention.

---

[1]T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10494-10516 (1986).
[2] 22 U.S.C. 9001 *et seq*.
[3]Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited September 20, 2023).

### III.    FACTS

8.      The Mother was born in 1996 in Northampton, England and is 27 years old.  She is a citizen of the United Kingdom.

9.      The Mother grew up in Warwickshire, England, her family having moved there when she was two years old. She attended Warwick Prep school until she was 11 and then King's High School for Girls (also in Warwick) throughout her secondary education.

10.     The Mother's parents live in Warwickshire, England in the home in which the Mother grew up, and her siblings also live close by. The Mother's family is very close and supportive.

11.     The Father was born in Arizona, USA, in 1989 and is 34 years old.

12.     The Mother and Father both have careers in the entertainment industry.

13.     The Mother is an actor and has worked in the entertainment industry since she was 13 years old.

14.     The Father is a very successful and popular musician and is one third of a band called "The Jonas Brothers" alongside his brothers, Kevin and Nick Jonas.  He is also a member of a group called "DNCE," which he set up in 2015. He performs and releases music with both groups in addition to performing as a DJ.

15.     The parties first met and began dating in October 2016 when the Father was on tour in the United Kingdom. The Mother was aged 20 at the time and the Father was aged 27.

16.     The parties' relationship moved quickly and they became engaged in October 2017.

17.     The parties had a legal wedding ceremony in Las Vegas, Nevada on May 1, 2019 and  celebrated their wedding with family and friends in Provence, France on June 29, 2019.

18.    From the beginning of the parties' relationship, they have spent regular time in England including with their friends and family. Until April 2023, the parties moved frequently due to the nature and requirements of their careers. In April 2023, the parties made England their permanent home.

19.    The parties' older daughter, WRJ, was born in 2020 in California. WRJ is a dual citizen of the United Kingdom and the United States.

20.    The parties' younger daughter, DMJ, was born in 2022 in Florida. DMJ is a dual citizen of the United Kingdom and the United States.

21.    As a result of their careers and the travel required for each of their careers, the parties had not, until April 2023, committed to setting down roots in any particular place. They lived a very peripatetic lifestyle. They did not need to settle in one location right away and lived in various properties.

22.    After the parties' older daughter was born, they purchased a property in Miami, Florida in 2021. The parties never planned to live in Miami on a long-term basis.

23.    All throughout their marriage, and particularly after their children were born, the parties often discussed their desire to raise their children in England and for their children to attend school in England. The parties regarded England as a safe location to raise their children.

24.    Over the Christmas holiday in 2022, the family spent time in England, near the Mother's parents' home in Warwickshire. The family stayed in a rental property called "the Old Farm House" approximately 20 minutes' drive from the Mother's parents' home.

25.    During their time in England over Christmas 2022, the Mother and Father jointly decided that they would look for their "forever home" in England, select a school for their older daughter in England, and settle their family in England.

26.     The parties agreed that the timing was right for the family to settle permanently in England, particularly given the older child's age. The parties were both excited for the family's move to England.

27.     The parties began to search for their "forever home" to purchase for the family in England. The parties began searching for their permanent home in England in December 2022 and continued their search through July 2023. The parties physically toured family homes in England together. They looked at a number of different areas in England, with the goal of purchasing a home in an area with good connections to Warwickshire and London. The parties found a beautiful country property in Henley on Thames, England, and both agreed they would purchase the property for the family's permanent home.

28.     The property is located at Little Stoke House, Little Stoke, Wallingford, Oxford, England. The parties' shared plan was to purchase the property together and raise their children together in the beautiful home and English country surroundings. Both parties were excited about the move for their family. The parties exchanged contracts with the sellers to purchase the property on July 7, 2023, with the completion date scheduled for December 2, 2023. The parties looked forward to spending their Christmas 2023 holiday with the children, family, and friends in their new home in England.

29.     In furtherance of their shared plan to settle the family in England, the parties listed their Miami, Florida property for sale. On or about April 16, 2023, the parties entered into a contract for the sale of their Miami property.

30.     On or about April 10, 2023, the family relocated to England. They initially stayed for a short period of time in a rental property in London. Thereafter, on or about May 5, 2023, the family moved into The Old Farm House (the property in which they had stayed for the Christmas

DocuSign Envelope ID: 61CB8EEB-1DA7-45B3-A3AE-4F7DA62DB852

2022 holiday). The parties rented The Old Farm House on a long term basis while they worked toward the purchase of their new home in England.

31.     Given the parties' respective work schedules and commitments, over the course of the last year, they had only stayed in the Miami property on three occasions, for a total of approximately 11 weeks. Until the family relocated to England on or about April 10, 2023, they spent a majority of their time living together in rental properties all over the world as follows:

A.  3 September to 1 October 2022: New York (rental);

B.  1 October to 7 October 2022: Puglia, Italy (rental);

C.  7 October to 15 October 2022: London (rental);

D.  15 October to 22 November 2022  New York (rental);

E.  22 November to 16 December 2022: Miami (parties' property);

F.  16 December to 23 December 2022: London (hotel);

G.  23 December to 27 December 2022: The Old Farm House, Hatton, Warwickshire (rental);

H.  27 December to 5 January 2023: London (hotel);

I.  5 January to 9 February 2023: Miami (parties' property);

J.  9 February to 16 February 2023: Lake Tahoe (rental);

K.  16 February to 20 February 2023: Las Vegas (hotel);

L.  20 February to 10 March 2023: Miami (parties' property);

M.  10 March to 25 March 2023: New York (rental);

N.  25 March to 29 March 2023: New York (rental);

O.  29 March to 31 March 2023: Hamptons (friend's house); and

P.  31 March to 10 April 2023: New York (rental).

32.     Before the family left Miami on or about March 10, 2023, they shipped many of the children's personal belongings to England. The remainder of the children's belongings were placed into storage, to be kept there until the parties had purchased a new home in England.

33.     On or about April 10, 2023, the family relocated to England.

34.     The children are both fully involved and integrated in all aspects of daily and cultural life in England.

35.     The children receive routine medical care and dental care in England.

36.     The children participate in extracurricular activities, playdates, and cultural activities in England. In particular, the older child has joined and participated in the Playbox Theatre Company. The younger child also attends baby sessions at the Playbox Theatre Company. Playbox Theatre Company is the company the Mother joined when she was three years old and for which she became an ambassador in 2014.

37.     The older child attended nursery school full-time in Warwickshire, England at Stepping Stones nursery.

38.     The parties' shared plan has always been for the children to be educated (including nursery school) in England.

39.     The Mother is fully involved in all of the children's schooling, medical care, dental care, cultural activities, extracurricular activities, and other activities in England. The Mother provides all of the children's day-to-day care in England.

40.     England is the children's habitual residence.

41.     In May 2023, the Mother started filming a new six-part drama series for ITVX, which was filming in various locations in the United Kingdom, including Warwickshire. The

Mother plays the main character in the series. This role is the first significant role the Mother has taken on since having the children.

42.     On July 31, 2023, the Father had to leave England, as scheduled, because he was due to start touring with his band in the United States. The parties knew that the Father's tour was scheduled when they relocated to England and when the Mother took on her role in the new series.

43.     The parties had therefore planned that the children would travel with the Father and the nanny for a vacation in August 2023 because the Mother's filming schedule for August 2023 was very intense, with long hours during the daytime when the children would be awake.

44.     When the Father is on tour, although his evenings are busy performing, he has periods of the day to spend time with the children. With some hesitation, the parties planned and agreed that it would be best for the children to travel with the Father and the family's nanny to the United States for the month of August, with the Mother travelling to meet the family in the United States in September 2023.  The children would then at least be able to spend some time during the day with one of their parents until the Mother finished her filming commitments.

45.     The parties agreed that the children moving around with the Father on tour was only going to be a temporary arrangement.

46.     The parties' agreed plan was that when the Mother finished filming on September 14, 2023, she would travel to New York to collect the children and return home to England. The parties' plan was for the Mother to spend a week with the family in New York, and then to return home to England with the children on September 20, 2023, where the Mother has a short work commitment on September 28, 2023.

47.     The parties' shared plan was for the Mother and children to join the Father and his extended family for part of the Father's band's United States tour, and then to return home to England.

48.     The family would continue to live in a rental property in England, and then move in together to their new home in England upon its completion in December 2023.

49.     In furtherance of the parties' shared plan, the children travelled to the United States with the Father and their nanny.

50.     Thereafter, the breakdown of the parties' marriage happened very suddenly. The parties had an argument on August 15, 2023. On or about September 1, 2023, the Father filed a divorce case against the Mother in Florida.  On or about September 5, 2023, the Mother found out through the media that the Father had filed for divorce.

51.     In his divorce filing in Florida, the Father seeks, *inter alia*, divorce, a parenting plan, and a timesharing schedule to be ordered by the Florida state court. The Father incorrectly claims in his divorce filings that the children have resided in Florida for the six months prior to the filing of the Father's Florida case.

52.     On or about September 17, 2023, the parties met to discuss their separation. The Mother reiterated the parties' agreed plan for the children to return home to England that week. The Father has possession of the children's passports. He refuses to return the passports to the Mother and refuses to send the children home to England with the Mother.

53.     The next day, the Mother's solicitor in England reconfirmed to the Father's Florida attorney that the Mother intended to return home to England with the children as planned on September 20, 2023, and requested that the children's passports be returned to the Mother.

54.     On September 19, 2023, the Father's Florida attorney confirmed that the Father will not return the passports to the Mother and will not consent for the children to return home to England.

55.     Based on the Father's express statements that he will not return the children to England and will not return the children's passports to the Mother, on September 20, 2023, the Mother has submitted her Hague Convention Application for Return to the Central Authority for England & Wales seeking the return of the children to England.

56.     The Mother is also initiating a child arrangements case in the appropriate English Court.

57.     The children were to be returned home to England on September 20, 2023. The Father has prevented the children's return to England, which is a breach of the Mother's rights of custody under English law, England being the children's habitual residence.

## IV.     COUNT I – WRONGFUL RETENTION

58.     The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 57 as if fully set forth herein.

59.     The Hague Convention applies to cases in which a child under the age of 16 years has been removed or retained from his or her habitual residence in breach of rights of custody under the law of the child's habitual residence, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

60.     The children here are under the age of 16.

61.     The children's habitual residence is England, and was England on the date the Father retained the children in the United States from England.

62.     From the totality of the circumstances perspective as of the date of retention on September 20, 2023, England was the children's home.

63.     England is the children's ordinary home and holds a degree of settled purpose from the children's perspective.

64.     The children are fully involved and integrated in all aspects of daily and cultural life in England. The children have extended family and friends in England. The children receive routine medical care and dental care in England. The older child attends school in England. Both children participates in extracurricular activities, playdates, and cultural activities in England.

65.     The parties' shared intent since at least December 2022 has always been for the children to live in England.

66.     The children have lived in England since April 10, 2023.

67.     At the time the Father retained the child in the United States from England, the Mother had (and continues to have) Hague Convention article 5*a* "rights of custody" to the child under English law by operation of law under The Children Act 1989.

68.     The Children Act 1989, Part 1, Section 2(1) provides that "[w]here a child's father and mother were married to, or civil partners of, each other at the time of his birth, they shall each have parental responsibility for the child."

69.     The parties were married at the time of the birth of each of the children. The Mother therefore has joint parental responsibility for both children under The Children Act Part 1, Section 2(1).

70.     Parental responsibility is defined in The Children Act Part 1, Section 3 as "all the rights, duties, powers responsibilities and authority which by law a parent of a child has in relation to the child and his property."

71.     The rights and responsibilities of a person entitled to parental responsibility under English law necessarily involve the "care of the child." Joint parental responsibility is therefore a right of custody under English law and Article 5*a* of the Hague Convention.

72.     The Mother has joint parental responsibility for both children as defined by the Children Act 1989. She has this right by operation of law, and she had this right at the time the Father retained the children in the United States from England.

73.     There are no court orders entered by any court anywhere in the world changing the parties' respective *ex lege* rights of custody to the children in this case.

74.     Joint parental rights are 'rights of custody' under Article 5*a* of the Hague Convention.

75.     The Mother has these rights by operation of law without any orders having been entered relating to the children by any English court, and she had these rights at the time the Father retained the children in the United States from England.

76.     The Father's retention of the child in the United States is therefore in breach of the Mother's Hague Convention article 5*a* "rights of custody."

77.     At the time the Father retained the children in the United States, the Mother was exercising her rights of custody within the meaning of Articles 3 and 5*a* of the Convention by living with the children, caring for the children, fully participating in the children's lives, and undertaking all parental rights since each child was born, and would have been so exercising her rights of custody but for the retention.

78.     The Father's retention of the children in the United States from England is therefore wrongful under the Hague Convention because the Father has retained the children from their

habitual residence of England, in breach of the Mother's rights of custody to the children under English law, which the Mother was exercising at the time of the retention.

79.    Notice is given in this pleading that the Mother is relying upon foreign law. FED. R. CIV. P. 44.1.

80.    The Mother has requested the return of the children to England. She has submitted her Application for Return with the Central Authority for England & Wales. The Mother has never consented or acquiesced to the removal of the children from England.

81.    The Mother has promptly, and to the best of her ability, taken all legal steps available to her to seek the return of the children to England.

82.    The children are currently temporarily physically located with the Mother within the Southern District of New York at The St. Regis New York, Two E. 55th Street, New York, NY 10022.

## V.    COUNT II – ARTICLE 18 RETURN

83.    The Mother restates and re-alleges the allegations contained in Paragraphs 1 through 82 as if fully set forth herein.

84.    The Mother invokes Article 18 of the Convention, which grants this Court plenary power to order the children's return at any time.

## VI.    ATTORNEYS' FEES AND COSTS PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

85.    The Mother has incurred, and will continue to incur, reasonable and necessary attorneys' fees, expenses and costs as a result of the Father's wrongful retention of the children.

86.    The Mother respectfully requests that this Court award her all of her reasonable and necessary expenses and costs incurred in accordance with ICARA § 9007, upon the filing of a

separate motion for reasonable and necessary expenses and costs in accordance with ICARA, the

Federal Rules, and this Court's Local Rules.

**WHEREFORE**, the Mother respectfully requests the following relief:

A.      That this Verified Petition for Return of Children to England be granted;

B.      That the Father be ordered to pay the Mother's reasonable and necessary attorneys'

fees and expenses, including but not limited to suit money, expenses, and costs; and

C.      That this Court grant any such further relief as justice and the Mother's cause may

require.

**VERIFICATION**

PURSUANT TO 28 U.S.C.A. §1746, I DECLARE UNDER THE PENALTY OF PERJURY
THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON ___9/20/2023___.

_A829D3CF64E44ED..._

Sophie Turner

/s/ Matthew T. Wagman
Matthew T. Wagman, Bar No. 794922
Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD 21202
(410) 385-3859
mwagman@milesstockbridge.com

Stephen J. Cullen, *Pro Hac Vice to Be Filed*
Kelly A. Powers, *Pro Hac Vice to Be Filed*
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, DC 20004
(202) 465-8374
(410) 385-3709 (fax)
scullen@milesstockbridge.com
kpowers@milesstockbridge.com

*Attorneys for Petitioner*